Good morning. Good morning, Your Honors. My name is Thomas Kaufman. I'm a counsel for Wells Fargo, the appellant in this matter. I'd like to reserve three minutes of my time for rebuttal. I see it's on the clock. Keep your eye on it. We'll try to help you. I'd like to start off by talking about the reimbursement, the Section 2802 claim, and then talk about the timeliness 204 claim. As a point, if I were the judges looking at this, a question I would ask, and I think I should address it, is, is this really a class certification or a merits issue? And it is a class certification issue, even though it overlaps with the merits. I don't know if Your Honors have any questions about that, but just generally speaking, I think what the judge should have done here is examine what are the elements of a 2802 claim for expense reimbursement. And if he had done and looked at those correctly and identified those correctly, he would have seen that the answer to that varies from person to person. He can still do that if we send it back, right? He can still do that if we agree with your opponent. He could. I mean, I would suggest that here this is basically interlocutory, right? Completely. I mean, one of your options could be to set forth a correct standard of what it means to be a necessary expenditure and send it back to Judge Spiro to decide. Or you could look at the record, as I think we have done, and based on the admissions that were made by opposing counsel, that this is an optional expense and more — about half the people don't incur one of the two expenses, that it just — there's no possible way to find that it could be certified, and you could just order him to deny certification. But that would be up to you. Let's assume for a moment that, at least in my case, I think the District Judge did consider the underlying legal issues in 2802. And you took the position, the bank did, that non-mandatory expenses are per se non-recoverable under Section 2802. The word mandatory I wouldn't quite agree with. Expense has to be necessary, which means required. But that question of what is required can be a close factual question between what's required and what's just very helpful. Well, let's assume, as I think the District Judge assumed, that it meant that the bank was saying these had to be expenses that they had to have, that it was necessary. It wasn't optional, it was necessary. Correct. And that only those are recoverable. What's your authority for that? I couldn't find any. Okay. I think it's implicit, certainly, in the Morgan case and the Buchanan case we've talked about. But Morgan's distinguishable, isn't it? Because in that case, you had a really quite different factual situation. You did, in the sense that the similarity was there was an expenditure that the business, the wet seal company, encouraged employees to do. It had a policy that said you had to comply with the dress code policy. And one way to comply with that dress code policy was to wear stylish wet seal clothing. And in that sense, here, I think it's actually further away from it. That case, I think, is a stronger argument for it being required because there at least was a requirement to meet some kind of dress code policy. There's no requirement here whatsoever to send mailers to your customers. There's only a general expectation to generate business. And you can do that a lot of ways that don't involve fast mail or the websites. And in fact, to the contrary, in the compensation plans itself, it says these are optional programs. You are not required to participate in And I think if you look at the cases that the appellees have cited, they're all district court cases, but I think they're all harmonized to that same analysis. You have, they said a case called TACACS, T-A-C-A-C-S, a case called SINOHEI, if I'm pronouncing that right, S-I-N-O-H-U-E-I, a case called McLeod, M-A-C-L-E-O-D. And all of them involve situations where there was a dispute of fact of whether it really was necessary or required to use these expenses to do the job. And I think the McLeod case is a great example. There, there's a question about mileage, mileage reimbursement. And it was evident that the employer created expectations for people to go out into the field and the only way to reasonably accomplish that would be driving around. Now, the employer could say, I didn't say you had to drive everywhere, you could walk everywhere, or you could try to do the job by telephone, but that would be inconsistent with the expectations. Here, there's nothing similar to that. There's, there's no, the plaintiff said, he conceded up front, management never told people you have to participate in this. Now, there might be individual cases. I think actually the appellant or the, the appellee said in his case, his manager told him you have to participate. But the other cases, Morgan and Buchanan in particular, I mean, you can't get closer than basically for Wells Fargo and these programs. In that case, the, there was the same fast mail program. There was arguments that management had, you know, made directives that led people to feel that they needed to participate in this. And the court denied class certification on the basis that you don't know that across the class. It could vary based on what one particular employee said to one different manager. And that's the record we have here as well, in that we submitted declarations from a handful, about 15 people, who explained different situations about what they had talked to their managers about or what, what value they got out of fast mail. And it shows variation that's never been rebutted by the other side. What Judge Spiro found was common is the job description and that there was a common fast mail program, and also websites. That's not the right question, though. The fact that there's a job, common job description, they all originate mortgage loans, doesn't answer the question of whether they reasonably were required to participate in fast mail or have a personal website to do their job. Now, I think the Plaintiff tries to conflate a little bit this notion of necessary and reasonable by pointing to 2802c. And I'm not sure if Your Honors have a question about that, but I think it's important, if you read the entire sentence of 2802c, in addition to the legislative history I've pointed out about why it's there, it's talking about reasonable and costs, pardon me, reasonable costs incurred by employees enforcing their rights. In other words, That's the Attorney's Fee Clause, right? Attorney's Fee Clause. It's all it is. So the fact that it mentions about reasonable costs does not mean that the legislature ever took the position that anything reasonable is also necessary. Like I said, there is a reasonableness in the analysis, but it's is it reasonable to call this necessary? Although it's a very different case, but the seminal case on the issue, Vons v. Grissom, you know, a lot of the 2802 cases prior to 2000 dealt with employees who got sued for something they did on their job and they wanted the employer to pay their attorney's fees. You've cited a number of cases. What's your best case that 2802 is inapplicable to this situation? I think my best cases are Morgan and Buchanan is by far the best case. I mean, Buchanan is, you can't get closer on point. It's the same people. I mean, it was a joint venture, but it's the same programs, the same issues, same everything. But in Vons v. Grissom, I think it's important. There they talked about where reasonableness comes into the analysis. They said that you have to look very specific facts to determine whether something was necessary under a particular circumstance. And in that case, an employee needed to have counsel to defend himself against something that happened on the job, and the employer offered him counsel. But he didn't, he found fault with that counsel. He thought that counsel might have a conflict of interest. And the court, I think we quoted it at some length in our opening brief, explains how the fact the employer offered him a lawyer doesn't mean that it was necessarily unnecessary for him to go get his own lawyer. And he said, for example, there could be specific facts. Maybe the employer is dragging its feet on picking somebody quickly, and he has a need to go to court. Or maybe he sees some fault that would make that improper. It's all a very specific factual question. You have to look at the specific facts to see if something was truly necessary. Now, in the cases that plaintiffs cited where they did certify classes for expense reimbursement, like Sinaway and McLeod, there was evidence that common need all the employees had. In Sinaway, it was for, I believe, cell phone usage when they were out in the field. And in McLeod, again, it was mileage. There's nothing in the record here similar to that. There's nothing here that shows people need to use this program. So I think on the 2802 front, if you have no other questions, I'll move on to — actually, one other thing I forgot to mention. The leading California Supreme Court case on expense reimbursement is Gattuso v. Hart-Hanks. It's cited in our papers. Now, it's a little different because it assumes an expense is necessary, and it talks about how you go about discharging the obligation to reimburse expenses. But it gives an example of when reimbursement would be required, and they say it's when, quote, an employer requires employees to drive on the job. So even there, the California Supreme Court is using this language about it being required, as opposed to just something that might be helpful. Okay, so if you don't have any further questions about that, I'll move on to Labor Code 204. The issue here is, when is it, with an incentive pay situation, that the obligation is triggered to that the compensation is earned for purposes of Labor Code 204? And I think both sides have pointed to the Peabody case in the California Supreme Court, and also there's a DLSC opinion letter, 2002-12-09-2, that say that, as a general matter, when something is earned is contractual, but if it's necessary to calculate something before you can actually figure out how much this commission is, the employer is, the commission isn't earned until those calculations happen. Now, here I think So your position on that is that if it took the bank a year to calculate it, they wouldn't be entitled to the fee? Is that right? Well, they use the term reasonably calculable, so I think if it was a sham, and the bank just said arbitrarily, that could be a question. That would be, you know, is that really reasonably calculable? But here, the compensation plan itself, the Court overlooked, a key part of 4D4, which is at page 456 of the record. It sets forth a specific example of how commissions are calculated, and I'll just read from it. It says, commission, and it says, gross commissions will be calculated according to the commission credit schedule and the loans funded in the month. The advance and downward adjustments will be subtracted to determine the net commissions. And then it talks about what happens to the net commissions. Our point is, net commissions is what you earn, and it says right at section 5A of the comp plan that, subject to the commission reconciliation process set forth above, net commissions, gross commissions less hourly pay advances, shall be paid on the last pay period each month. So the reason this is relevant is there's a whole process that has to be a calculation of what's out. And a key element of that is you have to have the employee's hours, because one of the elements in the downward adjustments is the hour, all the hours the employee works for the month, they're paid $12 an hour for, and that's a debit in the formula to calculate the commissions. They don't turn in their hours until the Friday of that week. So let's say the month ended on a Wednesday. The employer doesn't even have those hours until a couple days into the next month. So in any situation where the pay is earned after the end of the month, the employer's going to have at least until the 26th of the month to pay those commissions. And if it takes 15 days, they have actually until the very next month. The Court sidestepped all of that. It just said, I think that the compensation here is earned on the last day of the month, and there's nothing in the plan that says that. And if it really was silent, if it's unclear when these commissions are earned, according to the standard in Peabody and in the DLSC opinion letter, we have a reasonable amount of time to calculate the commission, and it's certainly not that very same day. So I think if the Court had considered the notion of how commissions are earned and when they're reasonably calculable, it would have seen that that's not an issue that's common across the class and would depend on the particular loans that are there. Now, I notice I'm running out of time. I'm going to save my remaining minute and a half, so thank you. Thank you. Darren Kaufman on behalf of the plaintiffs in the class. May it please the Court. I want to start off with the 2002 expense reimbursement claim. I think this Court in O'Hara v. Teamsters read the statute correctly when it's paraphrased what 2002 requires, and that is that there are two liability theories for when expenses are required to be paid. They noted that first, one theory is in the direct discharge of the duties or two, in obedience of instructions. We have proceeded in this case, as the district court noted, under theory one, under the direct discharge of the duties. And that means everything because it distinguishes Buchanan and Macy, Buchanan and Morgan, and I'll get into that a little further. Your argument is that these differences don't defeat predominance or commonality. Correct, because the question is what is reasonable under the circumstances, which gets to the next qualifier of when an expense needs to be reimbursed, because it not only has to meet one of those two theories, direct discharge of duties or in obedience of instructions, it also has to be necessarily incurred, as again this Court, O'Hara, noted. And if those differences are fatal on the merits, that applies class-wide. Correct. Correct. And I agree with my colleague, Mr. Kaufman, that Gattuso v. Hart-Hanks is very instructive in this case, because Gattuso first noted that the legislature has now defined what necessary expenditure is, and it says necessary expenditure is what is reasonable. And it's clearly not just talking about attorneys' fees, because the legislature said, including but not limited to attorneys' fees, so the legislature clearly meant that definition of necessary, i.e. reasonable, to be applicable beyond just attorneys' fees. And Gattuso, the Supreme Court in Gattuso, recognized that, because they used C to determine what is reasonable for reimbursing for mileage. And not only that, they actually paraphrased in their mind what is the task for necessary. And they said, what is necessary turns on the reasonableness of the employee's choices. Here there is a common question, is it reasonable for these loan officers to choose to buy two marketing tools that Wells Fargo marketed to them, told them not only was it reasonable, it was vital. It was very helpful. It was necessary to promote more loan sales, and that was their job. So we have Gattuso recognizing that 2002C definition of necessary doesn't mean mandatory, doesn't mean required, means reasonable under the circumstances, and they applied it in that case, and reiterated the standard in a way exactly how Judge Spiro saw it. You don't even need to go to the definition that the legislature has now provided. Even before that, courts saw necessary to mean reasonable under the circumstances, and I agree again with my colleague that the Vons v. Grissom case is very instructive, because Vons v. Grissoms turns to Black's law definition. They didn't use Webster's. They went to the Black's law definition of necessary, which says necessary has different meanings in different contexts, and in many contexts it means reasonable under the circumstances. What's useful? What's efficient? What is helpful? And based upon that, Grissom then announced the standard, which has been essentially codified in Subsection C, what is reasonable under the circumstances, and that's what Grissom said necessary means, and that is exactly what Judge Spiro used to determine whether there's common evidence. Now, whether we win or lose, who knows, but we have common evidence. Everyone's doing the same job. Everyone agrees that that job is to maximize loan sales, and everyone agrees that Wells Fargo has told these loan officers it is vital to use our Wells Fargo branded websites. Your counsel, as you know, your opponent is suggesting, in effect, that you're at too high a level. The fact that these are all loan officers and we're all doing that is not what counts here, but rather in the actual performance of their jobs, whether they had similar situations. Was everybody required to use these particular methods? Were the expenses common to all of them? What's your response to that? My response is not whether it was required because that's not the standard. No, it was necessary, reasonable. Was it reasonable under the circumstances? Uh-huh. And Wells Fargo has told that all the loan officers uniformly, without qualification, these individualized websites are vital. They didn't say for some people. They said to all loan officers, it's vital. Same thing with FastMile. It's really, really useful. It's really important. You should use it, not under certain circumstances or some loan officers might find it useful. They said to all of them, you should use this. So the question in my mind is a common question, was it the reasonable, because this is a reasonable standard, an objective standard, was it reasonable for any loan officer to make the decision to buy Wells Fargo's marketing tools? And that is the common question that I think is subject to a common answer. They may provide their evidence to show that it wasn't reasonable, but we think we have common evidence in Wells Fargo's own marketing of these tools to answer that question on a class-wide basis. So the Wells Fargo employees, officers, agents, whatever, who market these marketing products to these folks, to your clients, do they get a commission? The sales managers get a commission on the commissions earned by the loan officers, so everyone is benefiting from driving up loan sales. No, no, when they convince a loan officer to buy into one of these programs. Oh, I don't know if the marketing program gets a commission on how many people purchase it. Mind you, Wells Fargo has now changed the practice and they're now providing these at no cost. Okay. You want to talk about late payment? Sure. What's your response if you want to get to late payment? I don't want to control your argument. No, I just want to backtrack a little on why Buchanan and... Morgan. Morgan, thank you. Why those two are not apt. Because in both cases, on class cert, the plaintiff's counsel took the position that we are here to prove that all of our class members are required to purchase clothing or are required to purchase these marketing tools. And the district courts in both situations took them at their word, and as you do on class cert, you measure plaintiff's theory and whether it produces common questions, that can be answered with common evidence. And so, in that instance, in both cases, they said there's no common policy mandating that you buy our clothes or mandating you buy our marketing tools, so you're going to have to go manager by manager. We, again, have a different theory. We're under the direct discharge of duties theory, which, by the way, this court in O'Hara, again, recognized direct discharge of duty, is narrower than job-relatedness or in the course of scope. And so it's a narrow liability theory. And so that makes all the difference in the world in the outcome of whether this is a certifiable question or not. Judge Smith, to your question on 204, I don't think there's really any difference in what the opinion between Mr. Kaufman and myself on what the standard is. It's when was the commission earned, and that turns on when was it calculable or reasonably calculable. But it sounds like part of the calculation is a deduct for hourly wages. Is that right? That is true, and that's fine. And that differs from employee to employee. No, it doesn't differ from employee to employee because they have common policies that they apply universally. And the first policy is we always wait to the last pay period in the subsequent month to make these calculations. Well, doesn't it relate to lateness? I'm sorry. It would be one thing if the commission were fully earned and not subject to any deduction upon the loan funding. That would be clear, right? Yes. What your counsel says is there's another step. Even if there's another step, that step is known, that step is tied to events that are determined in that same month in which the commission credit is earned. So there's a two-step process, right? The compensation programs, all of them say your commission is credited to you when the loan funds. We look at the end of the month, what loans have funded, and that is when we give you the commission credit, and that determines the growth commissions. Now we need to back out of that loan referrals and the money we paid to you as an advance for hours worked. But both of those things are determined in the same month because it's the hours you worked in the month in which your loan closed. And by his own example, at the worst case scenario, you have their time records within six or at most seven days after the close of the month, and guess what? You still have three days to meet 204's requirement to calculate and pay. So our theory is the bank, all the events, all the conditions precedent required to calculate these loans occur in the month in which we are talking about, in the month that the loan funded. The work is done, the loan is funded, they know what all the partner referrals are long before the loan is even funded. All those things are known. There are events that occur in that month. It is just the policy of the bank to wait, to wait until the second or last period. And the question, common question is, is that reasonable? But your position is that it doesn't matter if there are distinctions from person to person for partner referrals, for example. Person A may have a partner referral, person B may not. Your position is it doesn't matter. It doesn't. Determine the common question one level up from there. It doesn't matter because all of those events you just identified, again, occurred in the same month in which the loan funded. Right. But the fact that there's a different net, dollars at the bottom. The debt doesn't matter. The fact of the matter is all the events required to make this calculation occurs in the month in which the loan funded, in the month that the loan, the commission credited is given to these loan officers. So both the credit and what deductions are necessary are tied to events that occur in the month. It just so happens Wells Fargo's policy is to wait to access the data regarding those events. Are you saying that all the data necessary are at all times in the possession of Wells Fargo? So, for example, the hours that are deducted, that would be in their possession at the end of the month or certainly within two or three days after the end of the month and within the time period referred to in 204. Yes, Your Honor. And I think the record's clear. I think the person, the most knowledgeable 30B6 witness can admit it to that. At the very worst, Wells Fargo has a policy of requiring time records be submitted on a Thursday. I grant you that those can be submitted after the last day of the month, but still within the 10-day window that the employer is required to calculate and pay. If you have nothing further. I think not. Thank you, Your Honor. Thank you. So the bank has a little time left. Yeah, very little. So on Labor Code 204, very quickly, if you accept that it's not calculable until a day after the end of the month, under Labor Code 204, Wells Fargo has until the 26th. You trigger when it's owed based on when it's earned, and it's earned when it's calculable. So that's something the judge missed. I think that's important. Two, the O'Hara v. Teamsters case has nothing to do with this case. That involved nothing about expense reimbursement. It wasn't addressing expense reimbursement. This notion that Morgan, they argued a different theory of liability than the plaintiffs are arguing here. It's just not true. The Morgan plaintiffs argued that there was a company policy that made expense reimbursement for clothing necessary. It's the same theory here. The statute itself, it's a quote from the statute. It says, An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence, A, of the discharge of her duties, B, of his or her obedience to the directions of the employer. Necessary modifies everything. This notion that if it's not ordered, there's no necessary requirement is not true. And even if there is a reasonableness to necessary, which I agree, all that means is you have to think is it really needed, necessary need, same root, under a reasonable looking at all the circumstances. And there's plenty of variation in the material evidence that I've mentioned. Some people use this to get people. Somebody else might be part of a community where they have their own forms of bringing in clients that don't involve mailing to them. There's no evidence of a common answer to that question. Okay. I think your time is up. Okay. Thank you. Okay. Thanks to all the counsel for their argument in this case. The case of Wynn v. Wells Fargo Bank is submitted.
judges: Hawkins, M. Smith, Jr., Lynn